Filed 6/23/16  In re Anthony H. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re ANTHONY H., et al., Persons Coming Under the Juvenile Court Law | B268774 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILREN AND FAMILY SERVICES, Plaintiff and Respondent, v. KATHERINE G., Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK85818) |

APPEAL from orders of the Superior Court of Los Angeles County, Akemi Arakaki, Judge.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel and William D. Thetford, Principal Deputy County Counsel for Plaintiff and Respondent.

_____

Katherine G. (mother) appeals from dependency orders denying her petition for modification and terminating her parental rights as to her children Alex H. (born in 2009), A.H. (born in 2010), Angel H. (born in 2011), and Anthony H. (born in 2013). (Welf. & Inst. Code, §§ 388, 366.26.)[1] We find substantial evidence to support the orders, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The quoted portion of the factual and procedural summary is taken from our previous opinion in *In re Anthony H.* (May 14, 2014, B251453 [nonpub. opn.]).[2]

"The family originally came to the attention of the [Los Angeles County Department of Children and Family Services (the department)] in December 2010, when police officers responded to a domestic violence call. In February 2011, the juvenile court sustained portions of a section 300 petition as to Alex and A.H., alleging a history of domestic violence and that both parents used methamphetamine and marijuana. [Citation.]

"The children were removed from the parents' custody and reunification services were ordered for the parents. In April 2012, father was arrested for domestic violence. The court sustained allegations of domestic violence and substance abuse in a separate section 300 petition as to Angel, and added him to the parents' reunification plan. When maternal grandmother requested removal of the children from her care due to ongoing problems with the parents, they were placed in foster care. [Citation.]

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

[2] This is the fourth appellate proceeding in this case. In *In re A.H.* (Oct. 17, 2013, B249811 [nonpub opn.]), we dismissed mother's appeal from jurisdictional and dispositional orders on Anthony's non-detained petition. In *In re Alex H.* (Dec. 23, 2013, B247978 [nonpub. opn.] (*Alex H.*)), we affirmed the denial of mother's section 388 petition seeking to reinstate reunification services as to Alex and A.H, or their return to her custody. Most recently, in *In re Anthony H.*, *supra* (B251453), we affirmed jurisdictional and dispositional orders removing Anthony from mother's custody.

2

"Mother's reunification services as to Alex and A.H. were terminated at the 18-month review hearing in June 2012.  She had been terminated from her domestic violence program for lack of attendance and had not completed a parenting program.  Although she had completed 21 individual counseling sessions and an outpatient substance abuse program, she had not enrolled in an after-care substance abuse program as recommended by her counselor.  Between February and April 2012, she missed five out of seven drug tests.  [Citation.]

"In June 2012, mother enrolled in a residential substance abuse program at Foley House.  An October report by her program counselor stated that she was uncooperative, had learned nothing from the program, and continued to prioritize her relationship with father over reunifying with the children.  In November 2012, pregnant with Anthony, mother moved to Building Blocks, a sober living facility, and enrolled in Options for Recovery, a one-year treatment program for pregnant women or mothers with substance abuse problems.  A section 366.26 hearing as to the older children was continued because no adoptive home had been found for Alex and A.H., and maternal grandmother's adoptive home study was unlikely to be approved.  Between April 2012 and January 2013, mother missed 11 drug tests.  She had tested negative nine times and positive for marijuana only once, in July 2012.  [Citation.]  Mother filed a section 388 petition as to the two oldest children in December 2012.  The court recognized that mother had made some progress, but concluded that her circumstances had not changed and returning the children to her would not be in their best interests.  We affirmed the denial of the section 388 petition in our unpublished opinion in *Alex H*., case No. B247978, filed in December 2013.

"While the dependency cases were pending as to mother's three older children, Anthony was born in January 2013.  He and mother tested negative for drugs.  On January 24, a team decisionmaking meeting was conducted as to Anthony.  Although meetings for mother and father had been scheduled two hours apart in light of the history of domestic violence, they arrived together.  Nevertheless, mother denied she was in a relationship with father at the time.  A second team decisionmaking meeting was held on

3

February 13, 2013 regarding Anthony. Once again, the parents arrived together despite separately scheduled meetings. The department recommended that Anthony be detained because of the parents' history of substance abuse and domestic violence.

"Mother's case manager from her sober living home participated in the team decisionmaking plan and reported mother was in compliance with her program. A safety plan was developed under which mother agreed to continue to comply with all court orders and the department would consider allowing Anthony to remain in her care at the sober living home. The department reconsidered this approach the next day and sought, but was denied, a warrant for Anthony's removal.

"On February 28, 2013, the department filed a dependency petition on Anthony's behalf. At the detention hearing the same date, the court conditioned release of Anthony to mother on her remaining in the sober living program. It ordered that mother could not change her residence without notifying the social worker. The minute order stated: 'The court advises the mother that even though the child has been returned to her care that court jurisdiction continues and the child is still under the jurisdiction of the court. [¶] *Until this case is closed, mother shall not change residence or that of the child without notifying the CSW. . . .* Violation of any of the above orders could result in the issuance of warrant for mother, removal of the child from her home, and even criminal prosecution.' (Italics added.)

"On April 10, 2013, the court sustained the original petition, finding Anthony was a child as described by section 300, subdivisions (b) and (j), based on the same facts alleged in the siblings' petitions and because mother was not in compliance with her case plan. Anthony was placed in home of mother under the supervision of the department. Mother was ordered to complete her outpatient program, participate in family maintenance services, and individual counseling. She was ordered to provide 10 consecutive random or on-demand drug tests and complete a full drug rehabilitation if she tested positive or missed a drug test. The court reiterated the orders made at the February 28 detention hearing: 'The court advises the mother that even though the child has been returned to her care that court jurisdiction continues and the child is still under

4

the jurisdiction of the court. [¶] *Until this case is closed, mother shall not change residence or that of the child without notifying the CSW. . . .* Violation of any of the above orders could result in the issuance of warrant for mother, removal of the child from her home, and even criminal prosecution.' (Italics added.)

"Mother appealed from the order sustaining the original petition as to Anthony. Appointed counsel for mother was unable to identify an arguable issue as to that order. We advised mother that she could submit any contentions she felt we should consider, but she did not do so. We dismissed the appeal as abandoned because no claim of error or other defect had been raised, pursuant to *In re Sade C.* (1996) 13 Cal.4th 952, 994 and *In re Phoenix H*. (2009) 47 Cal.4th 835.

"On April 22, 2013, mother telephoned the social worker and left a voice mail that she had been discharged from her sober living program 'due to "an unfortunate situation."' The detention report stated that mother said she '"went out"' on April 18, 2013 and took Anthony with her. She did not return to the sober living program because '"it was too late"' and said she stayed at a friend's house." The social worker spoke with mother and told her she was in violation of the order that she remain in a sober living program. The worker reminded mother that Anthony had been released to her on the condition that she remain in the sober living program. Mother stated she was aware of the order and planned to re-enroll at a sober living program. The worker inquired where mother had spent April 18 and 19, asking for contact information so she could assess the child's safety. Mother refused to provide the information, saying only that she had been at a friend's house. Mother denied using any drugs or alcohol during the weekend away from the sober living home. Maternal grandmother said mother and Anthony had stayed with her on April 20, but not on April 18, 19, and 21.

"Mother's sober living program manager at Building Blocks reported that mother was discharged from the program on April 19, for failing to return home on April 18, not following program guidelines, and asking other residents to lie on her behalf. She said mother had been previously reprimanded for other curfew violations.

5

"Mother spoke with the social worker on April 22, 2013 and said she was going to an interview that day with a sober living program called '"His Nesting Place."'  She was at her day substance abuse program, Options for Recovery.  Mother said she did not believe '"there was anything wrong with staying out"' and accused other residents at the sober living program of lying about her actions.

"The department decided to detain Anthony[, who was three months old,] because it could not assess or ensure the child's safety since mother was no longer residing at her sober living program, particularly because she would not reveal where she had been staying.  At a meeting with the social worker and the program coordinator at Options for Recovery, mother agreed to remove her belongings from maternal grandmother's home so Anthony could be placed there.

"A section 387 supplemental dependency petition was filed as to Anthony on April 25, 2013.  It alleged mother had been terminated from her sober living program on April 19, 2013, resulting in mother residing outside a sober living program in violation of juvenile court orders.  The department alleged that the child was endangered by mother's failure to comply with the court orders.

"In the detention report for April 25, 2013, the department said the family had received services since December 2010, but the parents' level of compliance had been minimal and not sufficient to ensure a safe and stable home environment for Anthony.  It recommended that the child be detained in the home of the maternal grandmother, that mother have monitored visits, and that all prior court orders not in conflict remain in full force and effect.  As of the preparation of the April 25, 2013 detention report, a few days after mother was discharged from her program, mother had not informed the social worker that she had enrolled in a new sober living program.

"In its report for the jurisdiction and disposition hearing on the supplemental petition on June 6, 2013, the department recommended that Anthony remain a dependent in suitable placement and that mother receive reunification services with random drug and alcohol testing.  A last minute information for the court filed June 6, 2013 attached documents from mother's substance abuse program stating that she had been discharged

6

on May 1, 2013, before completion of the program. Mother had violated a behavioral contract with the program by behaving disrespectfully and disruptively. She had struggled with the rules and structure of the program, and her commitment to practicing the tools of recovery had deteriorated for the past several months. She had 'a very difficult time accepting responsibility for her own role in situations that involved conflict with others.' She had completed portions of various classes and counseling sessions while in the program, and had submitted a total of 20 negative drug tests. Mother also failed to test on April 29, 2013 and May 13, 2013.

"A last minute information for the court dated June 17, 2013 stated that mother was in non-compliance with all areas of her treatment program at Behavioral Health Services/NCADD, including individual sessions, groups, and self-help meetings. Mother had not submitted to any random drug tests at the program. Maternal grandmother was approved for continued placement of Anthony with her.

"At the hearing on the section 387 petition, counsel for mother pointed out that at that time, mother's appeal from the adjudication of the original petition as to Anthony was still pending. The court acknowledged the argument, but found by a preponderance of the evidence that the section 387 petition was true and that Anthony was a person described by section 300, subdivisions (b) and (j). It found by clear and convincing evidence that there was a substantial danger to Anthony's physical health, safety, and emotional well-being if returned to mother's custody. It found there were no reasonable means by which Anthony's physical health could be protected without removing him from mother's custody. Anthony's custody was placed under supervision of the department for suitable placement. Family reunification services were ordered for mother, which included compliance with the original case plan, including a substance abuse aftercare program, with drug testing. Mother filed a timely appeal from the order." (*In re Anthony H.*, *supra*, B251453.)

In May 2013, father was arrested for engaging in domestic violence against mother. He was convicted of a misdemeanor and received a 320-day jail sentence.

7

Father committed another act of domestic violence against mother in January 2014, which resulted in a felony conviction and state prison sentence. According to the police report, father, while drinking, tried to force mother to have sex. He pulled her by the hair onto the bed, repeatedly punched her in the face, ripped off her clothing, punched her abdomen, and choked her, leaving red marks on her neck and bruises on her face and body.

All four children were living with maternal grandmother in 2014. The court scheduled permanency planning hearings for Alex and A.H. in October 2012, for Angel in June 2013, and for Anthony in April 2014. The court combined these hearings and continued them to a future date.

On May 14, 2014, we denied mother's appeal from the jurisdictional and dispositional orders as to Anthony, stating that "[s]ince his birth, mother had been terminated from two treatment programs and was not in compliance with other services ordered. She repeatedly missed drug tests. She disappeared with infant Anthony and refused to account for her whereabouts for a three-day period. Based on this evidence, we affirm." (*In re Anthony H.*, *supra*, (B251453).)

According to the December 8, 2014 status review report, mother had transitioned to a sober living home and was regularly visiting the children. Mother filed a section 388 petition seeking reinstatement of family reunification services and a home of parent order. The court scheduled a section 388 hearing, found the department's proposed plan of adoption by maternal grandmother to be appropriate, and continued the permanency planning hearing. Maternal grandmother's home was evaluated and approved for adoption in February 2015.

On May 4, 2015, Ms. Alo, the clinical director at House of Hope, a sober living facility, told the social worker that mother was in compliance with her program. The program required 20 hours of volunteer work each month (in addition to her part-time job at Taco Bell), five meetings per week (including Narcotics Anonymous, Alcoholics Anonymous, and 12-step meetings), and weekly meetings with a mentor. Ms Alo said

8

that mother "'still has a long way to go, it's a lifelong change, and her process has been really slow.'"

Father was released from prison on May 13, 2015. He contacted the department and was granted weekly monitored visits, which he attended on June 22 and 29, and July 13, 2015.

According to the interim review report for May 6, 2015, maternal grandmother was afraid of father and expected him to reunite with mother. Although maternal grandmother was still willing to adopt the children, her husband (Jose) no longer wanted to proceed. But the following month, Jose told the social worker that he did wish to proceed with the adoption, and that his previous statement was due to frustration over the lengthy adoption process.

In its June 8, 2015 report, the department advised that there were no barriers to the children's adoption by maternal grandmother. Mother was continuing to visit the children on a regular basis and was behaving appropriately during the visits.

The following month, the social worker learned from Ms. Alo that mother had resumed her relationship with father and had ceased making any progress with her recovery since May 4, 2015. According to Ms. Alo, mother "has gone 'backwards,' 'lies' about everything and has not made any effort on trying to get her kids back." Ms. Alo recommended that a permanent adoptive home be provided for the children, who "deserve to have a healthy mom."

During a monitored visit on July 13, 2015, father was asked by a social worker about his relationship with mother. He denied having any contact with mother since the last court date, "but proceeded to smile and giggle." The social worker "encouraged father to be honest and reminded him that this was a domestic violence case and that . . . being in a relationship with mother was not going to help the situation."

According to a last minute information for the court dated August 4, 2015, maternal grandmother had heard from several sources that mother and father were in a relationship. Maternal grandmother had received a photograph in a text message that confirmed the parents were together.

9

Father filed a section 388 petition in August 2015, seeking reunification services and either unmonitored visits or a "home of parents" order. He claimed to be participating in individual counseling for anger management and domestic violence, but provided no proof of enrollment.

An interim review report dated September 28, 2015, stated that father had purchased a vehicle and mother's visits had decreased. Her last visit was on August 9, Alex's birthday. The department expressed serious concern for the children's safety and well-being given the history of domestic violence between mother and father, whose current living situation was unknown.

Neither parent appeared at the combined section 388 and section 366.26 hearing on September 28, 2015. No live witness was presented. Documentary evidence— including the parents' section 388 petitions, the department's interim review reports, previously sustained petitions, and case plans—was received without objection.

At the section 388 phase of the hearing, counsel for mother requested six additional months of services. Counsel argued that mother had demonstrated a change in circumstances by maintaining regular and appropriate contact with the children and creating a bond with them. Father's attorney argued that since his release, father had shown a change in circumstances by visiting the children. Counsel for the children, Ms. McCormick, urged the denial of both petitions, citing Ms. Alo's observations that mother had regressed, and the department's recent information that mother had stopped visiting on a regular basis since father's release from prison.

The juvenile court found that neither parent had demonstrated a change in circumstances to warrant relief under section 388: "Looking at the totality of the situation, Ms. McCormick is abundantly accurate. Mom was doing great. And it happened just the way we all feared it would. Dad got out of custody and she went back to him, right back to the lifestyle. Hopefully, she is maintaining her sobriety. We don't know because she is not participating in programs, which she was doing when dad was locked up. And it is abundantly clear that she continues to this day to choose that man

10

over these children, and she made that choice." The court denied the section 388 petitions and turned to permanency planning issues.

Counsel for mother argued to preserve her parental rights because she "still maintains contact with her children and has a good relationship with her children. The bond should not be broken." The court interpreted this as a request to apply the parent-child relationship ("benefit") exception (§ 366.26, subd. (c)(1)(B)(i)), which it found did not apply "based on the relationship and lack of consistent visits and the circumstances in this matter."

After finding that continued jurisdiction was necessary, the children were adoptable and would suffer harm if returned to their parents, and that there were no applicable exceptions, the court terminated the parental rights of both parents and declared the children free from parental custody and control. (§ 366.26.) The department was ordered to provide adoptive planning and placement services for the children and maternal grandmother. Mother timely appealed.


## DISCUSSION

Mother challenges the denial of her section 388 petition, arguing that the evidence was insufficient to support the trial court's findings and orders. We disagree.

## I

Section 388 provides in relevant part: "(a)(1) Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

At a section 388 hearing, "the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make [the requested] change [or modification of a prior order] in the best interests of the child. (§ 388; *In re Audrey D.* (1979) 100 Cal.App.3d 34, 45; Cal.

11

Rules of Court, [former] rule 1432(f) [presently found at rule 5.570].) [¶] After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' (*In re Marilyn H.* [(1993)] 5 Cal.4th 295, 309), and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. (*Id.* at p. 302.)" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

This case has been pending for several years and during that time, the children have been without a permanent home. Alex, who is six years old, has not lived with mother since he was a year old. A.H., now age five, did not reside with mother after one month. Angel, age four, lived with her for only two months. Anthony, who is three years old, has not lived with mother since the age of three months.

Where, as here, the reunification period has expired and the children have been in placement for a lengthy period, the presumption that the children should be returned to the parent no longer applies. As the Supreme Court stated in *In re Jasmon O.* (1994) 8 Cal.4th 398, 420, "at the beginning of the dependency proceedings, our statutory scheme expresses a presumption in favor of keeping parents and children together. The burden of proof is on the Department to show that an out-of-home placement is necessary at the commencement of the proceedings (§ 361); and, at the mandatory review hearings every six months thereafter, the presumption is that the child should be returned to the parent unless the Department demonstrates that the child's return would 'create a substantial risk of detriment to the [child's] physical or emotional well-being.' (§§ 366.21, . . . 366.22, subd. (a).) Nonetheless, the Legislature also recognizes the child's interest in a stable, permanent home . . . , and has provided that the juvenile court should avoid delay and 'give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.' (§ 352, subd. (a).) The current statutory scheme makes it clear that the turning point at which the child's interest may outweigh that of the parent is reached no later than 18 months after the child has

12

been removed from the parental home, because the maximum length of time that reunification services are provided to the parent is 18 months. (§§ . . . 366.21, subd. [(g)], 366.22, subd. (a), 366.26; see also *In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.)"

The evidence showed that mother, who last visited her children on August 9, 2015, had not progressed in her recovery program since father's release from prison in May 2015. Ms. Alo observed that mother was more interested in being with father than regaining custody of her children, who deserve a stable adoptive home. Her negative evaluation and the department's ongoing concern that mother was placing her relationship with an abusive partner above the needs of her four young children provide substantial support for the court's finding that a modification of existing orders would not be in the best interests of the children.

On this record, mother's contention that there were no new incidents of domestic violence is unavailing. (See *In re E.B.* (2010) 184 Cal.App.4th 568 [domestic violence is likely to be repeated].) Given the parents' serious and unresolved history of domestic violence, a lack of new incidents does not compel a reversal of the trial court's ruling.

This case is distinguishable from *In re Kimberly F.* (1997) 56 Cal.App.4th 519, in which the appellate court reversed the denial of a mother's section 388 petition to regain custody of her two children. In that case, the evidence showed the mother had strong bonds with her children, ages 7 and 10, who were removed from her home because of its unsanitary condition. The children stated that they loved their mother and wanted to return home. (*Id.* at p. 524.) Although the evidence in this case shows that mother had pleasant visits with the children, the evidence also shows that she has serious unresolved issues with father regarding domestic violence, and it is uncertain whether she is capable of keeping them safe while she remains in that relationship.

## II

At a section 366.26 hearing, the court selects a permanent plan for the dependent child. Of the available options, "[a]doption is the preferred permanent plan. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1416.) Freeing a child for adoption requires termination of parental rights. In order to terminate parental rights, the court need only

13

make two findings: (1) that there is clear and convincing evidence that the minor will be adopted; and (2) that there has been a previous determination that reunification services shall be terminated.' (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249–250.)" (*In re Jasmine T.* (1999) 73 Cal.App.4th 209, 212.)

### A. Adoptability Finding

"If the court determines, based on the assessment provided as ordered under subdivision (i) of section 366.21, subdivision (b) of section 366.25, and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).)

"On appeal, we view the evidence in the light most favorable to the trial court's order, drawing every reasonable inference and resolving all conflicts in support of the judgment. [Citation.] An appellate court does not reweigh the evidence. [Citation.] Rather, we must determine whether there is substantial evidence from which a reasonable trier of fact could by clear and convincing evidence find a factual basis for the finding as to the child's adoptability. [Citation.]" (*In re Marina S.* (2005) 132 Cal.App.4th 158, 165.)

Although "it is not necessary that the minor already be in a potential adoptive home or that there be a prospective adoptive parent 'waiting in the wings[,' ¶] . . . [u]sually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family.* [Citation.]" (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649–1650.) "Alternatively, evidence of 'approved families willing to adopt a child of [this] "age, physical condition, and emotional state"'' can be used to evaluate the likelihood of the child's adoption. [Citations.]" (*In re Asia L.* (2003) 107 Cal.App.4th 498, 510.)

14

The evidence was undisputed that maternal grandmother's home had been approved for adoption in February 2015, and that, as of June 2015, both she and her husband were willing to proceed with her adoption of the children. This constitutes substantial support for the juvenile court's finding of adoptability. (See *In re Marina S.*, *supra*, 132 Cal.App.4th at p. 165 [child resided with grandparents who were interested in adopting her, which constitutes evidence she was likely to be adopted].)

Mother argues there is a legal impediment to adoption, citing Jose's statement in June 2015 that he did not wish to proceed with the adoption. (See Fam. Code, § 8603 ["A married person, not lawfully separated from the person's spouse, shall not adopt a child without the consent of the spouse, provided that the spouse is capable of giving that consent."].) Her argument overlooks Jose's subsequent explanation, which was not challenged in the trial court, that he wanted to adopt the children and had been frustrated by the lengthy adoption process. Assuming that his statements constitute conflicting evidence, it is for the trial court to determine the facts. Because we do not reweigh the evidence (*In re Marina S.*, *supra*, 132 Cal.App.4th at p. 165), we conclude the trial court's finding of adoptability is supported by substantial evidence.

B.      *The Benefit Exception*

The benefit exception is one of the few grounds for not terminating parental rights. (§ 366.26, subd. (c)(1)(B)(i).) It "applies if termination of parental rights would be detrimental to the child because the 'parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

The parent has the burden of establishing the benefit exception by showing that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's

15

particular needs are some of the variables which logically affect a parent/child bond." (*Id*. at pp. 575–576.)

As discussed, the children have not lived with mother since early childhood, and have spent most of their lives in out of home placements. Although mother visited her children, parents seeking to apply the benefit exception must "do more than demonstrate 'frequent and loving contact' (*In re Beatrice M*.[, *supra*,] 29 Cal.App.4th [at p.] 1418), an emotional bond with the child, or that the parents and child find their visits pleasant. (*In re Elizabeth M*. (1997) 52 Cal.App.4th 318, 324.) Rather, the parents must show that they occupy 'a parental role' in the child's life. (*In re Beatrice M*., *supra*, 29 Cal.App.4th at p. 1419.) . . . In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' (*In re Autumn H*.[, *supra*,] 27 Cal.App.4th [at p.] 575.)" (*In re Andrea R*. (1999) 75 Cal.App.4th 1093, 1108–1109.)

Because mother was residing at a sober living facility, she could not have the children live with her, and thus could not care for them on a daily basis. It is difficult for a parent to show that her children will benefit from preserving their relationship where, as here, the parent has not "advanced beyond supervised visitation. The difficulty is due to the factual circumstances of the parents in failing to reunify and establish a parental, rather than caretaker or friendly visitor relationship with the child." (*In re Casey D*. (1999) 70 Cal.App.4th 38, 51.)

Based on all of the circumstances present in this case, we conclude the record supports the juvenile court's finding that although mother's visits with her children were appropriate, she did not develop a parent-child relationship that warrants application of the benefit exception. This case is distinguishable from *In re Brandon C*. (1999) 71 Cal.App.4th 1530 and *In re Scott B*. (2010) 188 Cal.App.4th 452, in which guardianship

was the preferred permanent plan because the mother in each case had visited regularly for several years and had a well-established parental relationship with the children.

**DISPOSITION**

The orders denying mother's section 388 petition and terminating her parental rights are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                        EPSTEIN, P. J.

We concur:


WILLHITE, J.


MANELLA, J.